491 S.E.2d 765

**STATE of West Virginia ex rel. the STATE of West Virginia, Petitioner**

v.

**Honorable George W. HILL, Jr., Judge of the Circuit Court of Wood County, and Mark Francis Hanna, Respondents.**

No. 23857.

Supreme Court of Appeals of West Virginia.

Submitted May 6, 1997.

Decided July 11, 1997.

---

**4.** *See supra* note 2.

98

Harry G. Deitzler, Hill, Peterson, Carper, Bee & Deitzler, Charleston, Special Assistant Prosecuting Attorney.

William E. Kiger, Parkersburg, for Mark Francis Hanna.

PER CURIAM:

In this original proceeding for a writ of prohibition brought by the State of West Virginia (hereinafter Petitioner), we are asked to determine whether the Honorable George W. Hill, Jr., Judge of the Circuit Court of Wood County, a respondent herein (hereinafter the circuit court), erred in dismissing a murder indictment against Mark Francis Hanna, the defendant below and a respondent herein (hereinafter Defendant). By order entered on April 18, 1996, the circuit court dismissed the murder indictment against Defendant on grounds the indictment violated the mandatory joinder provisions of Rule 8 of the West Virginia Rules of Criminal Procedure and the Double Jeopardy Clauses of the United States and West Virginia Constitutions.[1] For the following reasons, we award the writ of prohibition and direct the circuit court to hold an additional hearing.

I.

## FACTUAL AND PROCEDURAL HISTORY

On March 21, 1985, Defendant was convicted by jury of burglary, kidnapping, and abduction with intent to defile. By order dated July 12, 1985, Defendant was sentenced to a term of not less than one nor more than fifteen years for the burglary conviction, a consecutive term of life imprisonment with a recommendation of mercy for the kidnapping conviction, and a concurrent term of not less than three nor more than ten years for the abduction conviction. In *State v. Hanna*, 180 W.Va. 598, 378 S.E.2d 640 (1989), we affirmed the kidnapping and burglary convictions, but we found insufficient evidence to support Defendant's conviction of abduction with intent to defile and, therefore, reversed that conviction.[2] Defendant currently remains incarcerated for the kidnapping and burglary offenses.

On January 12, 1996, Defendant was indicted for murdering Leslie Marty, the victim of the kidnapping. Ms. Marty has not

---

1. *See* U.S. Const. amend. V (providing, in part, that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb ... "); W. Va. Const. art. III, § 5 (stating, in part, that no person shall "be twice put in jeopardy of life or liberty for the same offence").

2. We remanded the case with directions to vacate the conviction and sentence for the abduction with intent to defile. 180 W.Va. at 607, 378 S.E.2d at 649.

been seen or heard from since the time of the kidnapping in 1983, nor has her body ever been found. Ms. Marty was declared dead on April 29, 1991, by order of the Wood County Commission.[3] Other than the passage of time and the declaration of death, Defendant claims that Petitioner is relying entirely upon facts about the alleged murder which were either known or reasonably should have been known by Petitioner at the time of the 1985 trial. Therefore, Defendant asserts Petitioner cannot charge him now for Ms. Marty's alleged murder because the murder charge should have been brought and tried at the same time as the other offenses. At the time of the first trial, Defendant asserts Petitioner knew or reasonably should have known of the following alleged facts.

Prior to the kidnapping, Defendant and Ms. Marty were in a dating relationship which had deteriorated to the point that the couple had "frequent arguments and episodes of domestic violence." 180 W.Va. at 600–01, 378 S.E.2d at 642–43. In June of 1983, Ms. Marty began dating a man by the name of Dwight Norman. *Id.* at 601, 378 S.E.2d at 643. On the evening of July 30, 1983, Defendant went to Mr. Norman's house, kicked in a locked door, and demanded to speak with Ms. Marty.[4] An argument ensued. During the course of the argument, Defendant stated he "had a contract out on" Mr. Norman and Ms. Marty, and Defendant referred to them as "dead meat." *Id.* Ms. Marty was able to get to a bedroom and lock the door, but Defendant drew a pistol from his pocket, aimed it at Mr. Norman, and directed Mr. Norman to get Ms. Marty to

come out of the bedroom. After Mr. Norman described the situation to Ms. Marty, she came out of the bedroom and left with Defendant. *Id.*[5]

At the 1985 trial, Defendant testified on his own behalf and said Ms. Marty voluntarily spent the night at his apartment after leaving Mr. Norman's house.[6] According to Defendant, he and Ms. Marty traveled to Ohio to eat at a McDonald's restaurant the next day. Thereafter, Defendant claimed he and Ms. Marty went shopping and visited a state park in Ohio. Defendant asserted the two stayed at a motel outside Columbus, Ohio, that night but, when he awoke the next morning, his money and Ms. Marty were gone. After looking for her at the motel and a nearby restaurant, Defendant said he came back to Parkersburg, West Virginia, and continued to search for her.

On cross examination, Defendant was questioned about statements he allegedly made to Robert Hall and Jeffrey Cravens in which Defendant admitted killing Ms. Marty. Defendant denied making the statements. In rebuttal, Mr. Hall testified he had two conversations with Defendant regarding Ms. Marty's disappearance. In the first conversation, Defendant said he shot Ms. Marty twice and then covered her body, but he did not say where the body could be located. Approximately one week later, Mr. Hall asked Defendant if Ms. Marty was still missing. In response, Defendant stated she would never be found, and he then retold Mr. Hall that he shot her. Similarly, Mr. Cravens testified that he asked Defendant late one night what happened to Ms. Marty. De-

---

3. In relevant part, a person is presumed dead under West Virginia Code § 44–9–1 (1997) when such

> person has been or shall be absent for seven or more successive years from the place of his last domicile within this State ... and ... shall for such period of time have been, or shall be, unheard of by those who, had he been alive, would naturally have heard of him; such person shall, in any case where his death shall come in question, be presumed in law to be dead, in the absence of proof to the contrary, or unless proof be made that he was alive within that time.

W. Va.Code § 44–9–1.

4. Defendant and Ms. Marty spent the previous night together, and Defendant was with Ms. Mar-

ty the next day when she went to Mr. Norman's house. When they arrived at Mr. Norman's house, Defendant and Ms. Marty "apparently [were] in the midst of an argument," and Ms. Marty "later told [Mr.] Norman that she never wanted to see the [D]efendant again." *Id.*

5. Ms. Marty did not say anything when she left with Defendant, and she did not take any of her personal belongings with her, despite the fact she was wearing only a bathing suit at the time. *Id.*

6. Defendant generally denied Mr. Norman's recollection of the events. Defendant also testified Ms. Marty kept clothes at his apartment and changed out of her bathing suit.

fendant, who was very intoxicated at the time, said something to the effect of shooting her twice in the head.[7]

Petitioner also presented testimony at the trial from Ms. Marty's friends and relatives who maintained that they have had no contact with Ms. Marty since she left with Defendant, despite the fact Ms. Marty had a young son she left behind. In addition, Robert Coffin, an F.B.I. Special Agent involved in investigating Ms. Marty's disappearance, testified on behalf of Petitioner and said his efforts to find Ms. Marty were unsuccessful. Mr. Coffin was unable to verify Defendant's contention that Ms. Marty traveled with him to Columbus, Ohio.

After reviewing the evidence available at the first trial, the circuit court stated it was not "made aware of any plausible evidence which would cause the Court to believe that the alleged murder of Leslie Diane Marty by this Defendant was not a part of the same act or transaction, or acts or transactions" as the other offenses. In addition, the circuit court found Petitioner reasonably knew prior to the 1985 trial that Defendant caused Ms. Marty's death. As a result, the circuit court dismissed the 1996 murder indictment brought against Defendant, finding it violated double jeopardy and the mandatory joinder rule set forth in Rule 8 of the West Virginia Rules of Criminal Procedure. Upon review of the record, we disagree with the circuit court and conclude the murder indictment violates neither double jeopardy nor the mandatory joinder rule. Nevertheless, we find it is necessary to remand the case for further evidence to be taken as to whether the delay violated Defendant's procedural due process rights.

## II.

## DISCUSSION

### A.

#### *The State's Right to Seek a Writimg of Prohibition*

 In criminal cases, we will permit the State to seek a writ of prohibition when it is alleged that a circuit court exceeded its jurisdiction by improperly interfering with the State's right to prosecute a case. *State ex rel. Forbes v. Canady*, 197 W.Va. 37, 42, 475 S.E.2d 37, 42 (1996). To be awarded a writ of prohibition, we specifically stated in syllabus point five of *State v. Lewis*, 188 W.Va. 85, 422 S.E.2d 807 (1992):

The State may seek a writ of prohibition in this Court in a criminal case where the trial court has exceeded or acted outside of its jurisdiction. Where the State claims that the trial court abused its legitimate powers, the State must demonstrate that the court's action was so flagrant that it was deprived of its right to prosecute the case or deprived of a valid conviction. In any event, the prohibition proceeding must offend neither the Double Jeopardy Clause nor the defendant's right to a speedy trial. Furthermore, the application for a writ of prohibition must be properly presented.

*Id.* Similar to the present case, the circuit court in *Forbes* dismissed an indictment against a defendant upon finding the newly indicted offense should have been joined with other related offenses for which the defendant already was tried. 197 W.Va. at 39–40, 475 S.E.2d at 39–40. Applying the standard set forth in syllabus point five of *Lewis*, we found that, if the circuit court erred when it dismissed the indictment, the dismissal would result in unjustly denying the State of its right to prosecute the defendant and of its right to seek a valid conviction. *Id.* at 42, 475 S.E.2d at 42. Therefore, we agreed to review the circuit court's order via the State's petition for a writ of prohibition. For this same reason, we find it appropriate to review the State's petition for a writ of prohibition in the present case.

### B.

#### *Mandatory Joinder of Criminal Offenses*

 In West Virginia, there is no statute of limitations for felony offenses. *State*

---

7. In a police report prepared before the 1985 trial, Mr. Cravens further told the police that Defendant laughingly said he had cleaned his car before the police were able to search it. In the same report, it is written that Defendant told Mr. Hall he shot Ms. Marty because she threatened to report him for setting fire to a business he owned.

*v. Carrico,* 189 W.Va. 40, 43, 427 S.E.2d 474, 477 (1993). However, pursuant to Rule 8(a) of the West Virginia Rules of Criminal Procedure, we require the State to charge defendants in separate counts in the same indictment of all crimes "based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan...." W. Va. R.Crim. P. 8(a).[8] As we recently explained in syllabus point three of *Forbes:*

> Rule 8(a) of the West Virginia Rules of Criminal Procedure compels the prosecuting attorney to charge in the same charging document all offenses based on the same act or transaction, or on two or more acts or transactions, connected together or constituting parts of a common scheme or plan, whether felonies, misdemeanors or both, provided that the offenses occurred in the same jurisdiction, and the prosecuting attorney knew or should have known of all the offenses, or had an opportunity to present all offenses prior to the time that jeopardy attaches in any one of the offenses.

*Id.*[9] The purpose of Rule 8(a) is not only "to avoid the harassment and anxiety of multiple trials" for defendants,[10] but it also promotes efficiency and fiscal economy within our judicial system by holding a unitary trial.

When the criteria set forth in Rule 8(a) are met, the burden to comply with the rule and join the alleged offenses rests with the State. Syl. Pt. 4, *Forbes.*[11] If the State fails to comply with the rule, it is the court's responsibility to dismiss any subsequent instrument which charges a defendant of committing offenses which should have been joined and tried in the first instance. Syl. Pt. 5, *Forbes.*[12] As stated above in syllabus point three of *Forbes,* however, it is a fortiori that mandatory joinder applies only to those offenses "based on the same act or transaction, or on two or more acts or transactions, connected together or constituting parts of a common scheme or plan...."[13]

8. When the first indictment was brought against Defendant and when the circuit court dismissed the murder indictment against Defendant, Rule 8(a) provided, in part:

> All offenses based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan shall be charged in the same indictment or information in a separate count for each offense, whether felonies or misdemeanors or both.

*Id.* In July of 1996, Rule 8(a) was amended and now states, in part:

> (2) Mandatory joinder.—If two or more offenses are known or should have been known by the exercise of due diligence to the attorney for the state at the time of the commencement of the prosecution and were committed within the same county having jurisdiction and venue of the offenses, all such offenses upon which the attorney for the state elects to proceed shall be prosecuted by separate counts in a single prosecution if they are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan, whether felonies or misdemeanors or both. Any offense required by this rule to be prosecuted by a separate count in a single prosecution cannot be subsequently prosecuted unless waived by the defendant.

*Id.* (amended by order entered July 17, 1996, effective September 1, 1996).

9. Rule 8(a)(2) now explicitly provides for the joinder of offenses covered therein which the attorney for the State either knows or should

know "by the exercise of due diligence" at the time the prosecution is commenced. *Id.; see* note 8, *supra.*

10. *State ex rel. Watson v. Ferguson,* 166 W.Va. 337, 344, 274 S.E.2d 440, 443 (1980); *Forbes,* 197 W.Va. at 43, 475 S.E.2d at 43.

11. Syllabus point four of *Forbes* states:

> Pursuant to Rule 8(a) of the West Virginia Rules of Criminal Procedure, the burden of joining multiple offenses arising out of the same act or transaction, or constituting parts of a common scheme or plan, occurring within the same jurisdiction, and which are known or should have been known to the prosecuting attorney, or which the prosecuting attorney had an opportunity to attend the proceeding where the first offense is presented, which is prior to the time that jeopardy attaches in any one of the offenses, is upon the State not on the defendant.

*Id.*

12. Syllabus point five states: "In the event that the State fails to comply with the mandatory provisions of Rule 8(a), and all of the elements requiring mandatory joinder are extant, then the charging document addressing any subsequent offenses must be dismissed." *Id.*

13. In addition, mandatory joinder will not apply if jeopardy attached to one of the alleged offenses before the prosecuting attorney had the opportunity to present all alleged offenses. Syl. Pt. 3,

In the present case, the circuit court reviewed the facts and found Petitioner "reasonably knew, prior to this Defendant's trial in 1985, that this Defendant had in some manner or by some means caused the death of Leslie Diane Marty." The circuit court also stated it could find no "plausible evidence" to explain why the alleged murder "was not a part of the same act or transaction, or acts or transactions" as the other offenses. Therefore, the circuit court dismissed the murder indictment, stating that the indictment violated Rule 8(a). On the other hand, Petitioner argues to this Court that the evidence does not support the circuit court's conclusions and the indictment was erroneously dismissed. Upon review of the facts, we find Petitioner was not required to join the murder charge with the other offenses pursuant to Rule 8(a).

Around 6 p.m. on the day of the kidnapping, Defendant went to Mr. Norman's house where Ms. Marty was visiting. *Hanna*, 180 W.Va. at 601, 378 S.E.2d at 643. Defendant gave Ms. Marty flowers and a card of apology, apparently to make amends for the argument Defendant had with Ms. Marty earlier in the day.[14] In the letter, Defendant expressed to Ms. Marty several times that he loved her and wanted a second chance with their relationship. Defendant further stated he "would do anything if ... [Ms. Marty] would at least talk to ... [him]."[15] While Defendant and Ms. Marty were talking, Ms. Marty was heard to say " 'stay out of my life.' " *Id.* at 601, 378 S.E.2d at 643.

About three hours later, Defendant arrived at Mr. Norman's house demanding to talk with Leslie. *Id.* Defendant represented he "had a contract out on" Ms. Marty and Mr. Norman and they were "dead meat." After Ms. Marty locked herself in a bedroom, Defendant brandished his gun and required her to come out of the bedroom, but he did not fire his gun at either of them. Thereafter, Defendant and Ms. Marty left together. *Id.* According to Defendant's testimony, he and Ms. Marty voluntarily spent the next two days together.

During the course of investigating Ms. Marty's disappearance, Petitioner received a crime and personality assessment of Defendant from Ronald P. Walker, an Investigative Profiler with the Behavioral Science Unit of the FBI Academy. Mr. Walker hypothesized that, after leaving Mr. Norman's house, Defendant "very likely took the victim to a private location with the intent of having a talk with her concerning their relationship." Mr. Walker believed the " 'talk' quickly deteriorated into a confrontation, initially verbal, then physical, with Hanna quite probably assaulting Marty with his hands." Mr. Walker also believed the assault was probably impulsive in nature, caused by Defendant's rage. Mr. Walker speculated Ms. Marty likely "suffered numerous blows to the head and face, and ultimately was strangled either by hand or ligature (manual strangulation is the most likely possibility)."

■ Given this assessment and the facts as stated above, there arguably was sufficient

---

*Forbes; see also* Syl. Pt. 2, *Cline v. Murensky*, 174 W.Va. 70, 322 S.E.2d 702 (1984) (finding the State was not barred from seeking an indictment for an offense arising from the same criminal transaction as another offense where the defendant pled guilty to the other offense in magistrate court and "prior to the taking of that plea, the prosecuting attorney had no knowledge of or opportunity to attend that magistrate court proceeding"). Mandatory joinder also will not apply where the prosecuting attorney did not know or have reason to know the alleged offense occurred.

14. *See supra* note 4.

15. In full, the letter stated:

" 'Dearest Leslie,

" 'I have had a lot of time to think today about how I feel about you. I realize now that

I have been smothering you. I know now that you need room to breathe. Leslie, I still love you, and I want to be yours. [Unintelligible] have your love, I would let you have the freedom you want and I would let you have whoever friends you want, including Dwight. Please just give me another chance to show you I can love you and you could still have your freedom. I love you with all my heart, and I am sorry I ruined your afternoon. No matter what you have decided about us, if you would just have a talk with me, I would appreciate it very much. Please call me at the Frontier.

" 'Your friend always,

" 'Mark

" 'P.S. I would do anything if you would at least talk to me.' "

*Id.* at 601 n. 2, 378 S.E.2d at 643 n. 2.

evidence to demonstrate Ms. Marty's alleged murder was based on separate acts and was not based upon "acts or transactions[ ] connected together or constituting parts of a common scheme or plan. . . ." Indeed, Petitioner reasonably could argue the weight of the evidence shows Defendant went to Mr. Norman's house and departed with Ms. Marty in a desperate attempt to win back her affections, with no intent to kill either Ms. Marty or Mr. Norman at that time. In the 1984 indictments, there are no references to any plan or scheme on the part of Defendant to kill Ms. Marty. In fact, the kidnapping indictment specifically states Ms. Marty was kidnaped by Defendant "with [the] intent of demanding from her [a] concession, to wit: a chance to continue his relationship with her. . . ." Moreover, on appeal of that conviction, we found sufficient evidence for the jury to believe Defendant removed Ms. Marty from Mr. Norman's house for the purpose of talking to her and attempting to persuade her to continue their relationship. 180 W.Va. at 605–06, 378 S.E.2d at 647–48.

Defendant clearly had the opportunity to kill both Ms. Marty and Mr. Norman when he kidnaped Ms. Marty, but he did not do so. Rather, Defendant had expressed several times that he merely wanted the chance to talk with Ms. Marty about their relationship.[16] In this light, Petitioner legitimately could argue that Defendant formulated no intent to kill Ms. Marty until some later time when, perhaps, she rebuffed his attempts at reconciliation. As Rule 8(a) *requires* that separate acts or transactions constitute parts of a common plan or scheme, it could be concluded that Petitioner was not required pursuant to Rule 8(a) to join the murder charge with the other offenses.

Furthermore, although Petitioner had reason to suspect Ms. Marty was murdered, there was insufficient evidence at the time of the first indictment to require mandatory joinder. In light of the fact that no body had

been found to confirm that Ms. Marty was dead, we find the mandatory joinder rule did not require Petitioner to push forward on a murder indictment in the absence of the passage of a substantial amount of time.

## C.

### *Double Jeopardy*

■ Given our holding in part B, *supra*, we make short shrift of Defendant's argument that the murder indictment violates double jeopardy. Double jeopardy prevents successive prosecutions and multiple punishments for the same offense. *State v. Rahman*, 199 W.Va. 144, 152, 483 S.E.2d 273, 281 (1996); Syl. Pt. 1, *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992). In *State v. Johnson*, 197 W.Va. 575, 476 S.E.2d 522 (1996), we made clear that the "same transaction" test is a procedural requirement under Rule 8(a) and the only constitutional test we use to determine whether multiple prosecutions violate double jeopardy is the "same evidence" test as announced by the United State Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). *Id.* at 574–75, 476 S.E.2d at 531–32.

■ As mentioned in *Johnson*, this Court essentially adopted the *Blockburger* "same evidence" test in syllabus point eight of *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983). *Id.* at 575, 476 S.E.2d at 532. In syllabus point eight of *Zaccagnini*, we stated: "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Applying this test to the case at bar, it is clear that, in order to convict Defendant of murdering Ms. Marty, Petitioner

---

**16.** Our finding of sufficient evidence to believe Defendant kidnaped Ms. Marty in order to discuss their relationship and not to kill her is different than our conclusion in Defendant's prior appeal where we found insufficient evidence to establish Defendant abducted Ms. Marty with the intent to defile her. In his prior appeal, we found "no evidence of any overt act or statement indicating that the defendant was sexually motivated to remove Leslie Marty from Norman's house. . . ." 180 W.Va. at 605, 378 S.E.2d at 647. On the other hand, as to their relationship generally, Defendant gave Ms. Marty a handwritten letter on the very day of the kidnapping, stating that he would "do anything" to get her to speak with him.

would need to prove beyond a reasonable doubt facts different than those which were necessary to convict Defendant of the burglary, kidnapping, and abduction with the intent to defile charges he originally was indicted and convicted of committing. In addition, those crimes for which Defendant already was convicted require proof of facts which are not required to be proven in a murder case.[17] *See* W. Va.Code § 61–2–1 (1977) (defining first and second degree murder);[18] W. Va.Code § 61–2–14 (1977) (setting forth the crime of abduction);[19] W. Va.Code § 61–2–14a (1977) (stating the elements of and the penalty for kidnapping);[20] W. Va.Code § 61–3–11 (1977) (declaring the elements of and the penalty for burglary).[21]

Nevertheless, Defendant asserts he cannot be tried for Ms. Marty's murder because this Court stated in syllabus point eight of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), that "[d]ouble jeopardy prohibits an accused charged with felony-murder, as defined by W. Va.Code § 61–2–1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony." Defendant argues that, because he already has been convicted of burglary and kidnapping, Petitioner cannot now pursue a murder charge against him. We find Defendant's contention without merit.

In West Virginia, we do not have indictments for first and second degree murder. *State v. Justice*, 191 W.Va. 261, 267, 445 S.E.2d 202, 208 (1994) (citing *State v. Schnelle*, 24 W.Va. 767 (1884)). Instead, we permit indictments for "murder," with the degree of murder contingent upon the proof presented at trial. *Id.* (citing *State v. Johnson*, 49 W.Va. 684, 39 S.E. 665 (1901)). "A general form of indictment for murder" is sufficient for a first or second degree murder conviction, or a conviction for any lower grade of homicide. *Id.* (citing *State v. Douglass*, 41 W.Va. 537, 23 S.E. 724 (1895)).

In the present case, the indictment does not specifically charge Defendant with felony murder. Rather, it generally provides that Defendant "did feloniously, willfully, maliciously, deliberately, and unlawfully slay, kill, and murder" Ms. Marty. Although we have said this language is sufficient for Petitioner to support a felony murder conviction,[22] Petitioner is not required to prove a felony was committed in order to convict Defendant of

17. Although two witnesses testified Defendant confessed to killing Ms. Marty, those witnesses were offered to provide rebuttal testimony to Defendant's testimony.

18. At the time the offense was committed, West Virginia Code § 61–2–1 (1977) provided, in part: "Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree." *Id.*

19. The 1977 version of West Virginia Code § 61–2–14 states, in part: "If any person take away, or detain against her will, a female person, with intent to marry or defile her ... he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than three nor more than ten years." *Id.* This section was rewritten in 1984, after the events giving rise to this case occurred.

20. West Virginia Code § 61–2–14a provides, in part:

If any person, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this State or within this State, or other-

wise kidnap any other person, for the purpose or with the intent of taking, receiving, demanding or extorting from such person ... any concession or advantage of any sort ... he shall be guilty of a felony.... 
*Id.*

21. West Virginia Code § 61–3–11 (1977) states, in part: "If any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house ∴.. of another, with intent to commit a felony or any larceny therein, he shall be deemed guilty of burglary." *Id.* This section was amended in 1993.

22. In syllabus point 5 of *State v. Bragg*, 160 W.Va. 455, 235 S.E.2d 466 (1977), we said:

An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under *W. Va.Code*, 61–2–1, to set forth the manner or means by which the death of the deceased was caused. 
*Id.*

Ms. Marty's murder. Moreover, it was not until 1991 that kidnapping was added to the list of enumerated felony offenses which could be used to establish felony murder.[23] As the events of this case occurred in 1983, constitutional protections against ex post facto laws prevent Petitioner from pursuing felony murder charges against Defendant based upon the kidnapping.[24] Therefore, as Defendant has never been tried for Ms. Marty's murder, we conclude the indictment does not violate double jeopardy principles.

### D.

### Preindictment Delay

The substantial and difficult issue left to be resolved in this case is whether the delay in bringing the indictment against Defendant violated his procedural due process rights. We addressed the impact preindictment delay may have on a defendant's procedural due process rights in *State ex rel. Leonard v. Hey*, 269 S.E.2d 394 (W.Va.1980). In *Leonard*, the defendant pled guilty to the 1967 murder of Henry Russell. *Id.*, 269 S.E.2d at 394. The defendant was sentenced to life imprisonment without mercy for the killing. In 1974, the Governor of West Virginia commuted the defendant's sentence to life imprisonment with mercy, which made the defendant eligible for parole in 1979. *Id.*, 269

S.E.2d at 395. The same year the defendant became eligible for parole, he was indicted for maliciously wounding the murder victim's wife during the same 1967 criminal episode. The State offered no explanation for the delay in bringing the indictment against the defendant, but this Court surmised it indicated a prosecutorial decision that the defendant should not be paroled. *Id.*

▮▮▮▮ Given the length of the delay in *Leonard*, we concluded in syllabus points one and two:

1. A delay of eleven years between the commission of a crime and the arrest or indictment of a defendant, his location and identification having been known throughout the period, is presumptively prejudicial to the defendant and violates his right to due process of law, U.S. Const. Amend. XIV, and W. Va. Const. art. 3, § 10. The presumption is rebuttable by the government.

2. The effects of less gross delays upon a defendant's due process rights must be determined by a trial court by weighing the reasons for delay against the impact of the delay upon the defendant's ability to defend himself.

*Id.*[25] Applying the presumption in syllabus point one to the facts of *Leonard*, we re-

---

23. The current version of West Virginia Code § 61–2–1, as last amended in 1991, provides, in part:
 Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, *kidnapping*, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.
 *Id.* (emphasis added). For the 1977 version of West Virginia Code § 61–2–1 in effect when Defendant allegedly committed the murder, see note 19, *supra*.

24. If a law is passed which increases punishment, lengthens sentences, or operates to an accused's detriment, ex post facto principles prevent the government from applying such law to offenses committed before the law took effect. Syl. Pt. 1, *Adkins v. Bordenkircher*, 164 W.Va.

292, 262 S.E.2d 885 (1980); *see* U.S. Const. art. I, § 10 ("No State shall ... pass any ... ex post facto Law...."); W. Va. Const. art. III, § 4 ("No ... ex post facto law ... shall be passed"). In addition, although burglary was an offense upon which a felony murder charge could be brought under the statute in effect in 1983, Defendant clearly did not murder Ms. Marty during the commission of the burglary.

25. While on first glance, it might appear that syllabus point two would not apply to the instant case, as the delay here exceeded eleven years, it must be kept in mind that there were absolutely no facts in the *Leonard* case not known to the State at the time the first indictment was brought. As previously mentioned, the defendant pled guilty to murder and, the same year he became eligible for parole as a result of a commutation of his sentence, he was indicted for maliciously wounding the murder victim's wife. The malicious wounding and the murder occurred during the same criminal episode. 269 S.E.2d at 395. It appeared rather obvious that

manded the case to give the State "an opportunity to justify the delay by proving its reasonableness." *Id.*, 269 S.E.2d at 398.[26]

To rebut the presumption of prejudice established in *Leonard*, in *Hundley v. Ashworth*, 181 W.Va. 379, 382 S.E.2d 573 (1989), we held the State need only demonstrate the delay was not orchestrated "to gain a tactical advantage over the defendant." 181 W. Va. at 383, 382 S.E.2d at 576–77.[27] If the State is able to make such a showing, the delay in obtaining the indictment does not violate the due process.[28] However, as stated by the Honorable Thomas B. Miller, Justice, in his concurring opinion in *Leonard*, whether based on the Due Process Clause of the Fifth Amendment or the right to a speedy trial provision contained in the Sixth Amendment, "decisions are nearly unanimous that a prolonged pretrial delay cannot be justified by the defendant's imprisonment on another offense." 269 S.E.2d at 399 (citations omitted). To permit the State to do otherwise would "override the court's authority to impose concurrent sentencing, the Governor's authority to commute, and the parole board's authority to pardon." *Id.*, 269 S.E.2d at 401.

In the present case, because the circuit court found a violation of the mandatory joinder rule, it did not reach the question of whether the delay violated Defendant's procedural due process rights. There were no findings of fact or conclusions of law with respect to this issue. Therefore, we find it is necessary for the circuit court to hold an additional hearing to consider evidence on this issue. At the hearing, Petitioner should be given the opportunity to explain its reason for the delay, and the circuit court must make a finding with regard to whether the delay was orchestrated "to gain a tactical advantage over the defendant." [29] Similarly, Defendant should have the opportunity to demonstrate what prejudice, if any, he will experience as a result of the delay. *See* Syl. Pt. 2, *Leonard.*

## III.

## CONCLUSION

For the foregoing reasons, we find the circuit court exceeded its legitimate jurisdiction when it found the murder indictment against Defendant violated Rule 8(a) of the West Virginia Rules of Criminal Procedure and the constitutional protections against double jeopardy. Thus, we grant Petitioner's request for a writ of prohibition of the circuit court's final order dismissing the mur-

the State did not prosecute the defendant on the malicious wounding charge because he already was sentenced to life without mercy. Only when the gubernatorial commutation was granted did the State invigorate the second indictment.

In the instant case, while the prosecutorial authorities may have suspected that homicide had occurred, they had no evidence at the time of the initial indictment upon which they could with confidence have sought an indictment for murder provable beyond a reasonable doubt. In the absence of a corpus delicti, the passage of time becomes an extremely important piece of evidence.

26. In situations in which a presumption of prejudice does not exist, we said in syllabus point one of *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982): "The general rule is that where there is a delay between the commission of the crime and the return of the indictment or the arrest of the defendant, the burden rests initially upon the defendant to demonstrate how such delay has prejudiced his case if such delay is not prima facie excessive."

27. In syllabus point two of *Hundley*, we stated:

The Due Process Clause of the Fifth Amendment to the United States Constitution and Article III, Section 10 of the West Virginia Constitution require the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the State's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.
*Id.*

28. The Sixth Amendment Right to a speedy trial does not apply to cases "where there has been no arrest or indictment." Syl. Pt. 2, *State v. Drachman*, 178 W.Va. 207, 358 S.E.2d 603 (1987). However, prearrest or preindictment delay may prejudice the defendant in terms of losing witnesses and other evidence, invoking application of the Due Process Clause contained in the Fifth Amendment. *Id.*

29. *Hundley*, 181 W.Va. at 383, 382 S.E.2d at 576–77.

der indictment against Defendant on these grounds. We also find it necessary, however, for additional evidence to be received on whether the delay in bringing the murder indictment against Defendant violates his procedural due process rights. Therefore, we remand this case with directions for the circuit court to hold an additional hearing on this issue.

Writ granted; remanded with directions.